David A. KONECNY, Petitioner,

v.

**DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent.**

The Holy Childhood Association,
Intervenor.

No. 80–833.

District of Columbia Court of Appeals.

Argued Dec. 2, 1981.

Decided June 22, 1982.

**32**

Barbara Mark Mauro, Valatie, N. Y., with whom Gail Harmon, Washington, D. C., was on the brief, for petitioner.

Michael A. Milwee, Washington, D. C., for respondent.

Herbert L. Awe, Washington, D. C., with whom Peter J. Kalis, Joseph A. Katarinci and Hayes C. Stover, Pittsburgh, Pa., were on the brief, for intervenor. Robert T. Carney, Washington, D. C., also entered an appearance for intervenor.

Before KERN, FERREN and BELSON, Associate Judges.

KERN, Associate Judge:

■ Petitioner Konecny challenges the exemption from contribution to the District of Columbia's unemployment compensation plan afforded churches and church-related organizations under D.C.Code 1973, § 46–301(b)(1)(D). We conclude that the Supreme Court's recent opinion in *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981), which upheld an exemption similar in many respects to the D.C. law, clearly establishes the validity of this exemption as an expression of the legislature's desire to maintain a "benevolent neutrality toward churches and religious exercise." *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 676–77, 90 S.Ct. 1409, 1415–16, 25 L.Ed.2d 697 (1970). We also hold that the guiding precedent of *Von Stauffenberg v. District Unemployment Compensation Board,* 148 U.S.App.D.C. 104, 459 F.2d 1128 (1972), mandates affirmance of respondent Department of Employment Service's decision denying petitioner's request for unemployment compensation benefits.

It is undisputed that petitioner Konecny terminated his employment with the Holy Childhood Association, a church organization, and would have been entitled to District of Columbia unemployment compensation had his erstwhile employer been covered by the District Unemployment Compensation Act. Pub.L.92–211, 85 Stat. 756. However, the respondent agency, after a hearing, concluded that petitioner's employer, a church organization, was exempt under the Act from making unemployment benefit contributions and therefore petitioner was not entitled to unemployment compensation.

Petitioner Konecny appeals his denial of benefits by respondent on two constitutional grounds:

First, the exemption of service in the employ of churches and religious organizations, in D.C.C.E. Section 46–301(b)(1)(D), is an unconstitutional violation of the Establishment Clause of the First Amendment, in that the exemption does not have a secular legislative purpose and its principal or primary effect is to advance religion. Second, the statutory mandate in D.C.C.E. Section 46–311, that employers provide information about the District of Columbia Unemployment Compensation Act only to employees covered by the Act, deprived Mr. Konecny, as an uncovered employee, of Equal Protection of the laws, in violation of the Due Process clause of the Fifth Amendment, in that the distinction between the two classes of employees (those covered

by the act and those who are not) with regard to notice provisions, fails both the rational basis and strict scrutiny tests of Equal Protection analysis. [Brief of Petitioner at 5–6.]

Petitioner acknowledges the decision in this jurisdiction of *Von Stauffenberg v. District Unemployment Compensation Board, supra*, upholding the predecessor D.C. unemployment compensation statute from a constitutional attack on the ground that it violated the Establishment Clause in the First Amendment.[1] However, petitioner asserts that the appeals courts there relied heavily upon the fact that the statute then provided an exemption for "a broad class of . . . nonprofit, quasi-public corporations," *Von Stauffenberg, supra* at 109, 459 F.2d at 1133. In contrast, petitioner argues, the revised D.C. statute challenged in the instant case only exempts from unemployment benefits "service performed . . . in the employ of . . . a church . . . or . . . an organization which is operated, supervised, controlled, or principally supported by a church . . . ." D.C.Code 1973, § 46–301(b)(1)(D)(i).[2]

However, a closer analysis of *Von Stauffenberg* indicates that the opinion was based upon the broader principle of permitting a state to include or exclude certain categories of employers from unemployment compensation coverage when it deems this necessary. *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 509, 57 S.Ct. 868, 872, 81 L.Ed. 1245 (1937). *Von Stauffenberg* also relied upon the language in *Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970), that "[t]here is no genuine nexus between tax exemption and establishment of religion." Finally, petitioner's insistence that the holding in *Von Stauffenberg* "should no longer be considered valid" because the exemption considered by the court at that time covered a "general class of exemption, nonprofit organizations" is proven to be unfounded by the court's specific holding after a careful consideration of *Walz*:

> [W]e must conclude that exemption of *religious organizations* from payment of the unemployment compensation act *does not violate the establishment clause of the First Amendment* and further, that the compelling governmental interest test is therefore inapplicable to the controversy. [*Von Stauffenberg, supra* 148 U.S. App.D.C. at 109, 459 F.2d at 1133 (emphasis added).]

The court specifically singled out the religious organizations deemed exempt by the then-existing unemployment compensation act and did not rely upon a "general class of exempt" organizations in finding no violation of the Establishment Clause.

In *Walz, supra*, the Supreme Court held that a New York statute exempting from a real property tax realty owned by an association organized for religious purposes and used exclusively for carrying out such purposes was not unconstitutional as an attempt to establish, sponsor or support religion or as an interference with the free exercise of religion. Petitioner attempts to distinguish *Walz* on the ground that the exemption upheld was a *property* tax exemption. However, an examination of the court's analysis in *Walz* reveals that the exemption was upheld on the broader, more general theory of maintaining a "benevolent neutrality toward churches and reli-

---

1. This clause provides:

   Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .

2. Initially, we point out the petitioner's claim that the statute exempts *only* churches, or organizations operated primarily for religious purposes, and ministers, is faulty. This exemption extends to patients employed in a rehabilitation facility or sheltered workshop, § 46–301(b)(1)(D)(iii), to individuals receiving employment work relief or work training under a program financed by a federal agency, state agency, or political subdivision thereof, § 46–301(b)(1)(D)(iv), and to inmates of custodial or penal institutions who work in hospitals in those institutions, § 46–301(b)(1)(D)(v). Thus, this statutory language of § 46–301(b)(1)(D) goes beyond churches and church related organizations, and the legislative scheme behind the statute cannot be construed as limited to the advancement or establishment of religious organizations only.

gious exercise," which has been "deeply embedded in the fabric of our national life, beginning with pre-Revoluntionary colonial times." *Id.*, 397 U.S. at 676–77, 90 S.Ct. at 1415. Most significantly, the Court maintained that "[t]he grant of a tax exemption [to religious organizations] is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." *Id.* at 675, 90 S.Ct. at 1414. Thus, based upon *Walz*, we conclude that this exemption does not violate the Establishment Clause of the First Amendment, since "the purpose of this exemption was not aimed at establishing, sponsoring, or supporting religion." *Id.* at 674, 90 S.Ct. at 1414.

■ We reach the same conclusion if we apply the three-part test enunciated in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), which the Supreme Court has traditionally applied to Establishment Clause cases.[3] A statute will be upheld if (1) it has a secular legislative purpose, (2) its principal or primary effect neither advances nor inhibits

religion, and (3) it does not foster excessive governmental entanglement with religion. *Committee for Public Education and Religious Liberty v. Regan*, 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); *Roemer v. Maryland Public Works Board*, 426 U.S. 736, 748, 96 S.Ct. 2337, 2345–46, 49 L.Ed.2d 179 (1976). "[T]he *Lemon v. Kurtzman* 'tests' are intended to apply to laws affording a uniform benefit to *all* religions." *Larson v. Valente*, —— U.S. ——, ——, 102 S.Ct. 1673, 1687, 72 L.Ed.2d 33 (1982) (emphasis in original).[4] Petitioner claims that the District of Columbia statutory exemption fails to pass the first two requirements of the three-part test.

Initially, we believe that *Von Stauffenberg* adequately addressed the first part of the three-part test in upholding the constitutionality of the predecessor tax exemption for various organizations. First, looking at the statute "as a whole," the court found that the primary goal of the unemployment compensation act "is to protect employees against economic dependency caused by temporary unemployment and to reduce the necessity of relief or other Wel-

---

**3.** Petitioner's attack upon § 46–301(b)(1)(D) as applied presents an "apparent obstacle" to application of the three-part test, as each element of the test normally requires an examination of the legislation as a whole. Because the exemptions enumerated in § 301(b)(1)(D) operate uniquely in each case, the narrow attack on this exemption is appropriate. However, "to the extent it is possible, we apply the *Nyquist [Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 772–73, 93 S.Ct. 2955, 2965–66, 37 L.Ed.2d 948 (1973)] test to determine the legitimacy" of § 301(b)(1)(D) as applied. *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1245 n. 9 (9th Cir. 1981). *See also Brandon v. Board of Education of Guilderland Central School District*, 635 F.2d 971, 978 (2d Cir. 1980). In *Tooley*, the Ninth Circuit upheld section 701(j) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(j) (1976), against a challenge based upon the Establishment Clause. Section 701(j) exempts individuals from union membership or paying mandatory union dues if their religion prohibits such beliefs by permitting these employees to make "substitute charity contributions." The court held that: "The accommodation demands neither direct nor indirect financial support of the plaintiffs' religion by the government, and cannot be reasonably construed as actively advancing or assisting their

religion." *Id.* at 1245; *cf. Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (exempting Amish children from State compulsory education laws); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (exempting Seventh-Day Adventists from state employment compensation requirements).

**4.** In *Larson v. Valente*, the Supreme Court discussed the three-part test in declaring as unconstitutional a Minnesota charitable contribution statute that exempted from its registration and reporting requirements only those religious organizations that solicited less than 50 percent of their funds from nonmembers. In describing the situations in which the three-part test is to be applied, the Supreme Court cited *Board of Education v. Allen*, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968) (involving a state law requiring local public school authorities to lend textbooks free of charge to all students in grades seven through twelve, including those in parochial schools); *Walz, supra;* and *Lemon* itself, where the challenged state laws provided aid to church-related elementary and secondary schools. *Larson v. Valente*, —— U.S. at —— n. 28, 102 S.Ct. at 1687 n. 28.

fare programs." *Id.* 148 U.S.App.D.C. at 107, 459 F.2d at 1131. This legislative purpose "affords no basis for a conclusion that the legislative intent was to advance religion." *Lemon v. Kurtzman, supra* 403 U.S. at 613, 91 S.Ct. at 2111. Then, in justifying the exemption from contribution granted to a certain group of employers, the court relied upon the legislature's ability to "strike at the evil where it is most felt, . . . or where it is most practicable to deal with it . . ." citing *Southern Coal and Coke Co., supra,* 301 U.S. at 519–20, 57 S.Ct. at 876–77. The court went on to hold that:

> [I]t is clear that denial of benefits to employees of exempt organizations is amply justified by considerations of administrative convenience and expense in the payment and measurement of benefits. [Citation omitted.] Thus, given the essentially correlative nature of the scheme Congress has chosen to employ, so long as the exemption itself is permissible the corresponding denial of benefits must likewise be valid. And since exemption of religious and charitable organizations is a concededly proper exercise of legislative power, exclusion of employees of such organizations from the benefit of the Act cannot be deemed unreasonable. [*Id.* 148 U.S.App.D.C. at 108, 459 F.2d at 1132.]

Here, the court's Establishment Clause premise that "exemption of religious and charitable organizations is a concededly proper exercise of legislative power" is so inextricably merged with its equal protection analysis as to make this holding sufficient to support a finding that the first of the three *Lemon* tests has been satisfied.

■ These exemptions, which included the presently existing exemption for churches and church-related organizations, clearly meet the overall secular legislative purpose of the efficient administration of the unemployment compensation act. *See Committee for Public Education v. Regan, supra,* 444 U.S. at 659, 100 S.Ct. at 849. Further, concerning the exemption itself, although § 301(b)(1)(D) results in "special treatment" for religious organizations, "this alone is insufficient to establish that the legislation lacks a clearly secular purpose." *Tooley v. Martin-Marietta Corp., supra* at 1245, *citing McGowan v. Maryland,* 366 U.S. 420, 445, 81 S.Ct. 1101, 1115, 6 L.Ed.2d 393 (1961); *Stone v. Graham,* 449 U.S. 39, 43, 101 S.Ct. 192, 195, 66 L.Ed.2d 199 (1980) (Rehnquist, J., dissenting). Because this exemption was intended to facilitate the orderly administration of the unemployment compensation laws, and, therefore, ultimately to promote the "broader policy" of the act, it has a legitimate secular purpose. *See Tooley v. Martin-Marietta Corp., supra.*

■ Second, we conclude that the *principal* or *primary* effect of the exemptions is not to advance religion but rather to maintain the "benevolent neutrality" toward churches and religious organizations traditionally recognized by the Supreme Court. *See Walz, supra,* 397 U.S. at 676, 90 S.Ct. at 1415. While one effect of the exemption for churches or church related organizations may be to permit such organizations to avoid burdensome unemployment compensation contributions, we believe that "any religious benefits of" an exemption would be "incidental" within the meaning of Supreme Court precedent. *Cf. Widmar v. Vincent,* —— U.S. ——, 102 S.Ct. 269, 276, 70 L.Ed.2d 440 (1981). (University policy excluding religious groups from the university's open-forum policy allowing general availability of university facilities held violative of fundamental principle that state regulations of speech be content neutral.) In *Widmar,* the Court rejected an argument made in support of the policy that allowing religious groups to share the limited public forum would have the "primary effect" of advancing religion. —— U.S. ——, 102 S.Ct. at 275–76. In considering that an open forum policy might possibly benefit religious groups, the Court pointed out that "a religious organization's enjoyment of merely 'incidental' benefits does not violate the prohibition against the 'primary advancement' of religion." *Id.* at 102 S.Ct. at 276; *Committee for Public Education v. Nyquist,* 413 U.S. 756, 771, 93 S.Ct. 2955, 2964–65, 37 L.Ed.2d 948 (1973).

Further, contentions, such as petitioner's that this exemption permits groups such as the Holy Childhood Association to use the funds for "religious purposes" have been found insufficient to invalidate a statute on grounds that its "primary purpose" is to advance religion. In *Committee for Public Education v. Regan, supra,* the Court upheld a statute appropriating public funds to reimburse both church-sponsored and secular non-public schools for administering standardized tests required by the state as nonviolative of the First and Fourteenth Amendments. In rejecting the challengers' argument that relieving these schools of the cost of grading state-required, state-furnished examinations would allow them to spend the savings on religious activities, the Court stated that it " 'has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends." ' *Id.,* 444 U.S. at 658, 100 S.Ct. at 849, *quoting from Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973), *see also Widmar,* —— U.S. ——, 102 S.Ct. at 277 n. 15.

Significantly, the Supreme Court has recently upheld an exemption similar in many respects to section 301(b)(1). *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981). The statute in question there had granted exemptions from unemployment compensation contributions to churches, religious organizations, ministers, and schools which were not institutions of higher learning. S.D.Comp.Laws Ann. § 61–1–10.4 (1978 rev. and 1980 Supp.) This was the state analogue to the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3309(b) (1976 ed. and Supp. III). In 1976, Congress eliminated the exemption of schools which are not institutions of higher learning, and the Secretary of Labor determined that these amendments were intended to extend state coverage of unemployment programs to church-related schools. He also determined that the remaining exemptions under § 3309(b)(1) and (2) were not applicable to church-run schools. *Id.* at 778–79, 101 S.Ct. at 2146. South Dakota

accepted this ruling and proceeded to require church-related primary and secondary schools to contribute to the states' unemployment compensation programs. The petitioners in *St. Martin* challenged the new unemployment compensation tax on statutory grounds and on the basis that holding them subject to such taxes would violate both the Free Exercise and Establishment Clauses of the First Amendment.

The Court reversed on statutory construction grounds the State Supreme Court's ruling, which would have permitted South Dakota to subject church-related schools to unemployment compensation contributions. *Id.* at 787–88, 101 S.Ct. at 2151. The Court did not address the First Amendment issues raised by petitioners. *Id.* However, in undertaking an analysis of FUTA's legislative history and the impact of Congressional amendments, the Court never questioned the constitutionality of the exemption of churches and religious organizations under FUTA § 3309(b)(1) or (b)(2). As pointed out in *St. Martin,* a statute is to be construed, if at all possible, to avoid raising doubts of its constitutionality. *Id.* at 780–81, 101 S.Ct. at 2147; *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 297, 76 L.Ed. 598 (1932). To argue that the Supreme Court, in deciding *St. Martin,* ignored the overriding consideration of maintaining a "benevolent neutrality" toward churches and church-related organizations would endorse an internally inconsistent legal analysis. In contradiction to petitioner's claims here, the Supreme Court cannot narrowly uphold a statute on "statutory construction" grounds without also considering its overall constitutionality in relation to the Bill of Rights. Because the statute could be construed as constitutionally valid from its plain meaning, the Court did *not* also have to specifically consider the First Amendment grounds for its legitimacy.

Finally, the current administration of the unemployment compensation scheme in the District of Columbia, including the present exemptions under 301(b)(1)(D), avoids "excessive entanglement" with religion as required by the three-part test. As the Court

held in *Walz*, we find that "the exemption creates only a minimal and remote involvement between church and state and far less than taxation of churches. It restricts the fiscal relationship between church and state, and tends to complement and reinforce the desired separation insulating each from the other." *Walz, supra* 397 U.S. at 676, 90 S.Ct. at 1415; *Committee for Public Education v. Regan, supra,* 444 U.S. at 659–60, 100 S.Ct. at 849–50. These observations are just as valid when considering the D.C. Unemployment Compensation Act and the exemption afforded the Holy Childhood Association as they were when the Supreme Court was considering the exemption from property taxes afforded religious organizations in *Walz.*[5]

■ For the reasons stated above, we find that the exemption from unemployment compensation coverage allowed, among others, churches and religious organizations contained in D.C.Code 1973, § 46–301(b)(1)(D) does not violate the Establishment Clause of the First Amendment of the United States Constitution, and we affirm the decision of the Department of Employ-

ment Services denying petitioner's claim seeking unemployment compensation benefits.[6]

*Affirmed.*

---

5. In fact, the possibility of excessive entanglement could be greater here than in *Walz* if the exemption were held to be invalid. In *Walz,* the Court was concerned with the entanglement created by tax valuation of church property, tax liens and tax foreclosures. These involve relatively objective determinations. On the other hand, under the unemployment compensation laws, the review afforded dismissed employees often requires a determination of whether the dismissal was based on "good cause." This is a uniquely subjective determination when considering that "good cause" as applied to a religious organization may differ significantly from a secular agency's definition of "good cause." The potential for church-state entanglement in such situations is considerable.

6. In addition to his argument challenging the constitutionality of § 46–301(b)(1)(D), petitioner claims he was denied equal protection and due process of law because he did not receive notice of his *ineligibility* for unemployment compensation benefits while covered employees receive routine notice of their eligibility for such benefits.

 Petitioner has not demonstrated that he is a member of a "suspect class," *see Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), and he has failed to show

that this statute unduly burdens his exercise of a "fundamental right." *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Therefore, the "rational basis" test, not the "strict scrutiny" test, is applicable here. Economic legislation involving taxation will be upheld under the "rationality" test where the justification is merely "legitimate." *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974).

 Also, the statutory notice requirement that covered employees be informed of their eligibility for unemployment compensation benefits and the lack of a similar "notice" requirement to ineligible employees does not deprive petitioner of "life, liberty or property" sufficient to rise to a denial of procedural due process. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1970). Finally, this notice requirement does not "create" a liberty or property interest in uncovered employees entitling them to the procedural due process of receiving notification of their ineligibility for benefits. *See Leis v. Flynt,* 439 U.S. 438, 441, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979) (and cases cited therein).